M. W. McCOY v. ALTON TILLMAN.

(Filed 12 April, 1944.)

**1. Animals § 2—**

Where adjoining landowners apportion to each a part of the division fence to be kept in repair, each is liable for trespass on the lands of the other committed by his livestock through defects resulting from his failure to perform the duty assumed. Conversely, if one fails to keep his part of

the fence in repair and as a result the livestock of the other landowner trespasses upon his land, he may not recover from the other damages therefor.

**2. Same—**

However, all persons are under the statutory duty of restraining their livestock from running at large, G. S., 68-23, and when out of the pasture such stock is at large and is subject to be taken up and impounded by any person, G. S., 68-24, even though they are at large as a result of the negligence of the person who so impounds them, where the owner has knowledge of their being at large and neglects to restrain them.

APPEAL by plaintiff from *Williams, J.,* at February Term, 1944, of CRAVEN.

Civil action commenced in justice of peace court for recovery of two hogs of the value of $30.00 allegedly wrongfully detained by defendant, tried in Superior Court on appeal thereto by defendant from judgment of justice of peace.

Plaintiff alleges ownership of the two hogs described in the summons and that they were wrongfully detained by defendant. On the other hand, defendant denies the claim of plaintiff, and asserts that he bought the hogs at a public sale, pursuant to impounding statute, G. S., 68-24 and -25, and as such purchaser he is the rightful owner and entitled to possession of the hogs.

Upon the trial in Superior Court evidence for plaintiff tended to show these facts: At the times referred to, plaintiff and R. M. Wood were adjoining landowners with a division fence between their respective holdings. In 1936 persons selected by them for the purpose determined and designated the part of the fence that should be kept up by plaintiff, and the part of it that should be kept up by R. M. Wood, and plaintiff and Wood "agreed to erect and keep up the fence as designated." Plaintiff kept up his part of the fence. Wood failed to keep up his part of it. A part of the fence which Wood agreed to keep up "fences one side" of plaintiff's hog pasture. On 3 May, 1943, the part of the fence which "Wood agreed to keep up was out of repair," and plaintiff's hogs went through holes in that part of the fence, and on that day Wood notified plaintiff that his hogs were in Wood's corn field rooting up his corn, and asked plaintiff to get them out, but as plaintiff testified: "I did not promise; I did not say I would; I didn't do anything. No, I didn't get them out then. I did not fix the fence." After notifying plaintiff Wood put the hogs up in a pen, but later in the afternoon of that day the hogs got out of the pen and returned to plaintiff's pasture. The next day Wood went to home of plaintiff and told him that his hogs had been in his, Wood's, corn field again, and that he had taken two of them out of the field and put them in a pen, and that plaintiff "could get them by

paying the damage that had been done and expense of shutting them up."
Plaintiff told Wood that "the hogs had gotten out because he failed to
keep up his part of the fence," and "refused to pay him anything . . .,"
"refused to pay him for taking up the hogs and feeding them." Wood
advertised the hogs for sale on 17 May, 1943, under C. S., 1851, now
G. S., 68-25. A written notice of sale was mailed to plaintiff, and he
had notice of it ten days before the sale. Plaintiff went to the sale,
which was attended by four or five others. At the request of plaintiff,
W. H. Heath went to Wood and asked for the hogs, but Wood refused to
surrender them unless plaintiff "paid his charges." At the sale and
before he sold the hogs Wood asked plaintiff if he "wanted to pay him ·
$7.50 for impounding and feeding the hogs and take them," but plaintiff
refused to do it and protested the sale and told all present that "whoever
bought the hogs would buy a lawsuit." Then Wood sold the hogs to his
brother-in-law and tenant, the defendant, for $10.00, and offered to plain-
tiff $2.50, which he refused to accept. This action was begun while
defendant held the hogs, though he sold them before plaintiff "could get
them." The fair market value of the hogs at the time Wood took them
up and sold them was $30.00 to $35.00, and defendant said he sold them
for $34.02.

Plaintiff as witness for himself said: "I know all about taking up
stock. In February, 1943, I took up a cow belonging to Mr. Wood. I
did not notify Mr. Wood I had his cow. Mr. Wood was sick in the
hospital at the time. When he came to see me he paid me $3.00 to get
his cow. I took up Mr. Sermon's cows about the same time. There was
court action about them. He took them back by claim and delivery."

Defendant having reserved exception to refusal of court to allow his
motion for judgment as in case of nonsuit, offered evidence tending to
show this version of the facts: On 3 May, 1943, plaintiff's hogs were in
Wood's corn field rooting up his young corn. Wood went down in the
field where plaintiff was operating a tractor and told him that his hogs
were out of the pasture, and were in his corn field and asked plaintiff
to get them out. Plaintiff did not answer, and did not go then to get the
hogs out of the field. Wood then took up the hogs and put them in a pen,
but later in the evening plaintiff's wife called the hogs and they broke
out of the pen and went back to the pasture. The next day the hogs were
again in Wood's field, and he took them up, and went over to see·plaintiff
at his home and told him to come and get the hogs and pay for taking
them up and feeding, but he refused to get them. Two days later plain-
tiff sent Heath to see Wood about getting the hogs and Wood told him
that plaintiff could get them if he paid $2.00 for taking them up and
feeding them. After three days Wood advertised the hogs for sale "to
cover costs and expenses of impounding and feeding said stock," as stated

in the written notice of sale, and sold them at public sale on 17 May—when and where five or six persons were present. Wood asked plaintiff if he would pay $7.50 to cover expenses of taking up hogs and feeding, and take the hogs, and, upon his refusal to do so, Wood sold the hogs to defendant for $10.00. Wood's charges was $7.50 and he offered plaintiff $2.50, which he refused to accept. Defendant further offered evidence tending to show that plaintiff "never fixed or kept up his section of the dividing fence as was designated . . . in 1936."

Wood, as witness for defendant, testified, "We were required and agreed to set new posts and run two strands of barbed wire across top of the fence. McCoy has never strung the wire and has never fixed or kept up any portion of his section of the fence. He allowed the posts to rot and the fence to fall down. It would not keep any stock from crossing over his section of the fence. I strung the two strands of wire over the top of my section of the fence, set lightwood posts and maintained the fence in good condition. In February, 1943, McCoy took up one of my cows that had crossed over his section of the division fence . . . I asked him to let me have the cow. He refused and made me pay $3.00 . . . I then asked McCoy to fix his section of the fence. He told me that he was never going to fix the fence. I then told him that unless he fixed his section of the fence as he had agreed to do, I was not going to keep my section of the fence adjoining his hog pasture. He established his hog pasture after 1936 on a part of the section of the fence I was to keep up. At the sale McCoy tried to keep others from buying the hogs by stating if they bought they would buy a lawsuit. On the day of the sale, McCoy stated . . . in my presence that he had never intended to keep up his section of the fence after it was settled in 1936."

Defendant further offered evidence tending to show deficiency of the section of the fence plaintiff was to keep up, that portions of it were down, some of it was "down not over a foot or two from the ground," and that no barbed wire was strung across the top, and that the section which Wood was to keep up was in fair condition, and had two strands of barbed wire on top of the fence.

Defendant further admitted that he sold the hogs for $34.02, but testified that he sold them before plaintiff brought suit.

At close of all the evidence, the court allowed defendant's demurrer to the evidence and granted judgment as in case of nonsuit. Plaintiff appeals therefrom to Supreme Court and assigns error.

*R. A. Nunn for plaintiff, appellant.*
*W. H. Lee for defendant, appellee.*

Winborne, J.  Upon all the evidence in the record on this appeal taken in the light most favorable to plaintiff, this is the basic question for decision: Did R. M. Wood have the right to impound the plaintiff's hogs?  If he did, the judgment below is correct.  If he did not, there is error in refusing to let the case go to the jury upon proper issues.

In this connection it is pertinent to review the appropriate stock law effective in this State.  It is provided that it is a misdemeanor for any person to allow his livestock to run at large within the limits of any county, township, or district in which a stock law prevails pursuant to law.  G. S., 68-23, formerly C. S., 1849.  It is also provided that "any person may take up any livestock running at large within any township or district wherein the stock law shall be in force and impound the same," and that "such impounder may demand fifty cents for each animal so taken up, and twenty-five cents for each animal for each day such stock is kept impounded, and may retain the same . . . until all legal charges for impounding said stock and for damages caused by the same are paid, the damages to be ascertained by two disinterested freeholders to be selected by the owner and impounder . . . and their decision to be final." G. S., 68-24, formerly C. S., 1850.  It is further provided that "if any person shall impound any animal and shall fail to supply to same during such confinement a sufficient quantity of good and wholesome food and furnish water he shall be guilty of a misdemeanor," G. S., 68-28, formerly C. S., 1854, and provision is made for collecting of the owner of the animal "the reasonable cost of such food and water." G. S., 68-29, formerly C. S., 1855.

Moreover, it is provided that "if the owner of such stock be known by the impounder he shall immediately inform the owner where his stock is impounded, and if the owner shall for two days after such notice willfully refuse or neglect to redeem his stock, then the impounder, after ten days written notice" posted as indicated and in form required, "shall sell the stock at public auction, and apply the proceeds in accordance with the provisions of this article, and the balance he shall turn over to the owner if known . . ." G. S., 68-25, formerly C. S., 1851.

And in this connection, the statute pertaining to fences prescribes what is a lawful fence in Craven County, G. S., 68-2, formerly C. S., 1828. And the general statute as to division fences provides that "where two or more persons have lands adjoining, which are either cultivated or used as a pasture for stock, the respective owners of each piece of land shall make and maintain one-half of the fence upon the dividing line." G. S., 68-6, formerly C. S., 1832.

And it is further provided by statute that "if any person who is liable to build or keep up a part of any division fence fails at any time to do so, the owner of the adjoining land, after notice, may build or repair

the whole, and recover of the delinquent one-half of the cost before any court having jurisdiction." G. S., 68-7, formerly C. S., 1833.

Furthermore, the authorities dealing with the subject generally hold that where adjoining landowners have apportioned to each a part of the division fence to be kept in repair by him, each is liable for trespass on the lands of the other committed by his livestock through defects resulting from his failure to perform the duty assumed. Conversely, if he fail to keep his part of the fence in repair, and as a result the livestock of the other landowner trespasses upon his land, he may not recover from the other damages therefor. See 2 Amer. Jur., 776, Animals; sec. 112, 3 C. J. S., 1296, Animals, 186 (b), and cases cited.

Applying these statutes and principles to the evidence in the case in hand, and conceding as plaintiff's evidence tends to show that R. M. Wood, the adjoining landowner, neglected to maintain that part of the fence which he had agreed to keep in repair, and that as a result plaintiff's hogs got out of his pasture and trespassed upon Wood's corn field, Wood may not recover of plaintiff damage resulting from such trespass.

However, plaintiff was under the statutory duty of restraining his stock from running at large. G. S., 68-23, formerly C. S., 1849. When the hogs were out of his pasture they were at large in so far as he was concerned, and subject to be taken up by "any person" and impounded. G. S., 68-24, formerly C. S., 1850. And even though they may have been at large as result of negligence of his neighbor Wood, as plaintiff's evidence tends to show, the plaintiff had knowledge of it, and elected not to repair the fence sufficiently to restrain his hogs from running at large, and as a matter of law he is not relieved of his statutory duty in that respect. Compare *Gardner v. Black,* 217 N. C., 573, 9 S. E. (2d), 10.

Manifestly, therefore, independent of his relation to plaintiff as an adjoining landowner, and irrespective of lack of legal right to claim damages for the trespass of the hogs, R. M. Wood had the right under the provisions of the statute, G. S., 68-24, formerly C. S., 1850, to take up the hogs of plaintiff running at large in stock law territory and to impound same.

And the evidence tends to show that the amount demanded of plaintiff by R. M. Wood is not greater than the cost of impounding allowed by statute, G. S., 68-24, formerly C. S., 1850, and for which the hogs were sold. Therefore, the sale to defendant was in accordance with law, and the judgment below is

Affirmed.